[No. 26470-2-I. Division One. January 14, 1991.]

THE MUNICIPALITY OF METROPOLITAN SEATTLE, *Appellant,*
v. THE PUBLIC EMPLOYMENT RELATIONS COMMISSION,
ET AL, *Respondents.*

*J. Markham Marshall* and *Preston, Thorgrimson, Shidler, Gates & Ellis,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Richard A. Heath, Assistant,* for respondent State.

234

*Richard D. Eadie,* for respondent Union.

FORREST, J.—In April 1984, the Municipality of Metropolitan Seattle (Metro) agreed with the City of Seattle to take over operation of the City's commuter pool program and specifically promised that:

> METRO shall succeed to the City's obligations under its collective bargaining agreement with the International Federation of Professional and Technical Engineers, Local 17, AFL–CIO, . . . as to the represented employees transferred.

Approximately 29 city employees, including five clerical employees represented by International Federation of Professional and Technical Engineers, Local 17, AFL–CIO (Local 17) were transferred to Metro pursuant to the agreement. The transferred employees were required to complete Metro's "Position Description Questionnaire" form and were reclassified into Metro's personnel system. Metro effected numerous changes of wages, hours and working conditions without notifying Local 17.[1] The employees were relocated to a Metro facility in Seattle. The commuter pool program continued to perform the same functions as when operated by the City of Seattle from the date of transfer through at least February 4, 1985.

After execution of the transfer agreement, officials of Local 17 and Metro exchanged correspondence. Metro refused to bargain with Local 17 or to recognize the union as the bargaining representative for the transferred clerical employees. Hence, on October 2, 1984, Local 17 filed suit in

---

[1]For example, there is uncontroverted evidence in the record indicating that the clerical employees were initially denied the cost of living increase promised under the collective bargaining agreement with the City. The employees were reclassified upon becoming Metro employees. There were differences in the vacation time transferred employees would be entitled to use. The employees, before transfer to Metro, were also entitled to "preference points" based on seniority when applying for other positions. They were formerly entitled to take time off for emergency leave and Martin Luther King's birthday. Finally, two part–time employees, who would have been entitled to full–time benefits under the collective bargaining agreement by virtue of their accumulated hours, were hired by Metro as transfer employees without the obligation to pay such benefits.

King County Superior Court to compel Metro to recognize and bargain with it.

Meanwhile, on September 28, 1984, Metro had filed a petition with the Public Employment Relations Commission (PERC) seeking clarification of the bargaining unit representing the transferred commuter pool clerical employees. Metro asserted that these employees were represented by Local 587 of the Amalgamated Transit Union. Local 587 has never claimed to represent the disputed clerical employees. Local 17 filed an unfair labor practice action against Metro on February 4, 1985. PERC stayed consideration of the complaint pending resolution of the bargaining unit clarification matter.

On March 21, 1986, the Executive Director of PERC determined that Local 17 was the exclusive bargaining representative of the commuter pool clerical employees transferred to Metro. On appeal to the full PERC board, Metro argued that its changes to operation of the commuter pool justified abolition of any bargaining unit represented by Local 17. PERC rejected the argument and affirmed the Executive Director's decision. Metro petitioned for judicial review. The Superior Court consolidated Metro's petition with the union's pending civil action. On November 17, 1987, the court affirmed PERC's decision in the unit clarification matter and ruled that Metro had acted in bad faith by refusing to recognize and bargain with Local 17. It ordered Metro to recognize Local 17 as the exclusive bargaining representative of the commuter pool clerical employees and awarded attorney fees to Local 17. In October 1989, the Court of Appeals affirmed in an unpublished opinion.[2]

After the Superior Court announced its decision on November 17, 1987, Metro petitioned PERC to terminate Metro's relationship with Local 17 on the ground that the work formerly assigned to Local 17 members had been

[2]*Public Empl. Relations Comm'n v. Metropolitan Seattle*, cause 21652–0–I (Oct. 4, 1989).

transferred to other Metro employees. PERC effectively denied this petition when it ruled on the union's still–pending unfair labor practice complaint. The PERC hearing examiner issued his order on January 19, 1988, holding that by unilaterally transferring unit work to nonunit employees and changing wages, hours and working conditions, and by refusing to recognize or bargain with Local 17, Metro had committed unfair labor practices. He also held that Metro had continuously asserted frivolous defenses to avoid its bargaining obligations.

As a remedy, PERC directed Metro to (1) restore its commuter pool operation to the status quo as of August 4, 1987; (2) make all five employees whole for any difference in wages and benefits actually paid and those called for by the last collective bargaining agreement; (3) reimburse Local 17 for its attorney fees and costs; (4) bargain with Local 17 in good faith; and (5) submit to "interest arbitration" if the parties were unable to agree on a contract. The Superior Court affirmed PERC's order.

This appeal presents two legal issues:[3] Did PERC exceed its authority by (1) ordering Metro to restore the commuter pool program to the status quo as of August 4, 1987, and by (2) ordering Metro to submit any issues unresolved by collective bargaining to interest arbitration pursuant to RCW 41.56.450?

RESTORATION OF STATUS QUO

Metro asserts that PERC's order requiring return of the commuter pool program to its status as of August 4, 1987, infringes on its managerial authority granted under RCW

---

[3]Metro concedes it was properly ordered to engage in collective bargaining as to wages, hours and conditions of employment and to make whole any monetary loss suffered by the employees as a result of any changes therein. Appellant did not argue the only assignment of error directed to PERC's findings of fact and, therefore, it need not be considered. RAP 10.3(a)(5); *BC Tire Corp. v. GTE Directories Corp.*, 46 Wn. App. 351, 355, 730 P.2d 726 (1986), *review denied*, 108 Wn.2d 1013 (1987). The other assignments raise the two legal issues stated.

35.58.240,[4] relying heavily on *First Nat'l Maintenance Corp. v. NLRB.*[5] In *First Nat'l,* the petitioner terminated his contract for cleaning and maintenance of a nursing home after a disagreement over a management fee. The employer failed, however, to bargain with the union about the decision to terminate the contract and the effects upon its 35 employees who worked at the nursing home. The union filed an unfair labor practice charge, alleging the petitioner had violated its duty to bargain in good faith with respect to wages, hours, and other conditions of employment. It was undisputed that the employer's refusal to bargain over the *effects* of its decision was a violation of the National Labor Relations Act (NLRA).[6] The Court noted that decisions involving a change in the scope and direction of the enterprise, which do not in themselves primarily concern conditions of employment, need not be bargained.[7] The Court held that the petitioner did not

---

[4] "If a metropolitan municipal corporation shall be authorized to perform the function of metropolitan transportation, it shall have the following powers in addition to the general powers granted by this chapter:

"(1) To prepare, adopt, and carry out a general comprehensive plan for public transportation service which will best serve the residents of the metropolitan area and to amend said plan from time to time to meet changed conditions and requirements."

[5] 452 U.S. 666, 69 L. Ed. 2d 318, 101 S. Ct. 2573 (1981). *See also International Ass'n of Fire Fighters, Local Union 1052 v. Public Empl. Relations Comm'n,* 113 Wn.2d 197, 778 P.2d 32 (1989); *Otis Elevator Co. v. Local 989, Int'l Union, United Auto., Aerospace & Agricultural Implement Workers,* 269 N.L.R.B. 891 (1984).

[6] *First Nat'l,* at 677 n.15.

[7] *First Nat'l,* at 677, relying on *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 13 L. Ed. 2d 233, 85 S. Ct. 398, 6 A.L.R.3d 1130 (1964). *See also International Ass'n of Fire Fighters, Local Union 1052 v. Public Empl. Relations Comm'n,* 113 Wn.2d 197, 201, 778 P.2d 32 (1989); *Spokane Educ. Ass'n v. Barnes,* 83 Wn.2d 366, 375–76, 517 P.2d 1362 (1974).

have a duty under the NLRA to negotiate over its decision to close a portion of its business.[8]

■ We agree that Metro is not required to bargain over changes in the scope and direction of the commuter pool program which do not primarily concern conditions of employment. Metro may reorganize a significant facet of its operation without bargaining, so long as the wages, hours and working conditions of represented employees are not affected. It is clearly implicit in PERC's order, however, that restoration of the commuter pool program to its former status is limited to the wages, hours and working conditions of the five transferred employees represented by Local 17. Its order does not affect management personnel, nor does it infringe upon Metro's prerogative to change the direction of its operations. PERC's exercise of its power under RCW 41.56.160 to compel Metro to comply with its duties under RCW 35.58.265 presents no conflict with Metro's transportation function. *First Nat'l,* which reaffirmed the requirement to bargain over the effects that employers' decisions have upon employees, actually supports the respondent's position. Moreover, Metro is required by statute to bargain the effects of its decisions upon represented employees.[9]

---

[8]*Accord, Otis Elevator Co. v. Local 989, Int'l Union, United Auto., Aerospace & Agricultural Implement Workers,* 269 N.L.R.B. 891 (1984) (company's decision to discontinue its research and development operations at one location and to consolidate them in another city to become more competitive was not subject to mandatory bargaining); *Morco Indus., Inc. v. Sheet Metal Workers Int'l Ass'n, Local Union 57,* 279 N.L.R.B. 762 (1986); *Drummond Coal Co. v. District 20, United Mine Workers,* 277 N.L.R.B. 1618 (1986) (respondent's decision to relocate its repair services to on–site mine repair shops and to close one facility turned on a change in the nature and direction of its business and did not require bargaining).

[9]RCW 41.56.030(4) states in part:

"'Collective bargaining' means the performance of the mutual obligations of the public employer and the exclusive bargaining representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to grievance procedures and collective negotiations on personnel matters, *including wages, hours and working conditions,* which may be peculiar to an appropriate bargaining unit of such public employer, except that by

Although Metro vaguely asserts the commuter pool program has been reorganized, it has failed to demonstrate any significant change in the duties performed by the transferred clerical workers. Indeed, the testimony of these employees indicates their duties after transfer to Metro are identical to those performed before the transfer. Metro finds itself in an awkward position: if there has been no substantial change in workers' responsibilities since the transfer and reorganization, then restoration of the status quo will not be unduly burdensome or prejudicial; if there has been substantial change, Metro has clearly violated its responsibility to bargain such changes under RCW 41.56-.030(4) and the transfer agreement.[10]

---

such obligation neither party shall be compelled to agree to a proposal or be required to make a concession unless otherwise provided in this chapter." (Italics ours.)

RCW 41.56.140 states in part:

"It shall be an unfair labor practice for a public employer:

". . . .

"(4) To refuse to engage in collective bargaining." *See also International Union of Operating Eng'rs, Local 609 v. Seattle Sch. Dist.,* Pub. Empl. Relations Comm'n Dec. 2079–B PECB (1986) (management was required to bargain with the union over the effects upon assistant engineers of its decision to install computerized controls on the boilers in four high schools); *Bremerton Patrolman's Ass'n v. Bremerton,* Pub. Empl. Relations Comm'n Dec. 2733 PECB, at 4 (1987) (City's refusal to bargain over effects upon employees after unilaterally changing the shifts, hours and schedules of its police officers was an unfair labor practice which violated RCW 41.56.140(4)).

[10]Moreover, RCW 35.58.265 states:

"If a metropolitan municipal corporation shall perform the metropolitan transportation function and shall acquire any existing transportation system, it *shall assume and observe all existing labor contracts relating to such system* and, to the extent necessary for operation of facilities, all of the employees of such acquired transportation system whose duties are necessary to operate efficiently the facilities acquired shall be appointed to comparable positions to those which they held at the time of such transfer, and no employee or retired or pensioned employee of such systems shall be placed in any worse position with respect to pension seniority, wages, sick leave, vacation or other benefits that he enjoyed as an employee of such system prior to such acquisition. The metropolitan municipal corporation *shall engage in collective bargaining with the duly appointed representatives of any employee labor organization having existing contracts with the acquired transportation system* and may enter into labor contracts with such employee labor organization." (Italics ours.) Even though Metro contends that the

240

Restoring the wages, hours and working conditions of the five transferred clerical employees to those existing as of August 4, 1987, simply does not interfere with Metro's authority and duty to manage its operations. There has been no showing that the date selected is inappropriate. Such an order is well within the authority granted to PERC in RCW 41.56.160.[11]

 The unfair labor practice here is patent, the remedy appropriate. Administrative agencies are vested with broad discretion and have the duty to determine what remedy is required in specific situations to effect the purposes of the Legislature.[12] The function of the remedy in an unfair labor practice case is to restore the situation, as nearly as possible, to that which would have occurred but for the violation.[13] The remedy must help restrain violations and remove or avoid the consequences of the violations.[14] RCW 41.56.160, which permits PERC to fashion appropriate solutions, is remedial in nature and, hence, is entitled to a liberal construction to effect its purposes.[15] PERC's remedy restores the status quo and is entitled to

commuter pool program is not a "transportation system" under this statute, it is still bound by the provisions of the transfer agreement.

[11]RCW 41.56.160 states in part:
"The Commission is empowered and directed to prevent any unfair labor practice and to issue appropriate remedial orders".

[12]*In re Case E–368*, 65 Wn.2d 22, 27–28, 395 P.2d 503 (1964); *State ex rel. Washington Fed'n of State Employees v. Board of Trustees of Central Wash. Univ.*, 93 Wn.2d 60, 68–69, 605 P.2d 1252 (1980).

[13]*Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 85 L. Ed. 1271, 61 S. Ct. 845, 133 A.L.R. 1217 (1941); *Kallmann v. NLRB*, 640 F.2d 1094, 1103 (9th Cir. 1981).

[14]*Local 60, United Bhd. of Carpenters v. NLRB*, 365 U.S. 651, 655, 6 L. Ed. 2d 1, 81 S. Ct. 875 (1961).

[15]*Nucleonics Alliance, Local Union 1–369 v. WPPSS*, 101 Wn.2d 24, 29, 677 P.2d 108 (1984); *Roza Irrig. Dist. v. State*, 80 Wn.2d 633, 639, 497 P.2d 166 (1972).

deference.[16] The trial court properly affirmed PERC's finding that Metro had committed an unfair labor practice by failing to bargain with Local 17 over changes to the transferred clerical employees' wages, hours and working conditions.

## INTEREST ARBITRATION

The findings and conclusions within PERC's order amply chronicle Metro's refusal to bargain with Local 17 and demonstrate why having the authority to order interest arbitration would be useful. PERC argues that Local 17 and the five public employees it here represents, who have no legal right to strike, will never be able to enforce their contract rights if PERC lacks the power to order such arbitration. The issue, however, is whether PERC has been granted such authority, not whether it would be desirable. We hold that it has not.[17]

▉▉ RCW 41.56.160 states in part: "The commission is empowered and directed to prevent any unfair labor practice and to issue appropriate remedial orders".[18] Although

---

[16]*Phelps Dodge; Case E–368. See also Smythe Mfg. Co. v. District 26, LL 354, Int'l Ass'n of Machinists,* 247 N.L.R.B. 1139, 1172 (1980) (where there was no evidence that restoration of the status quo would endanger the company's continued vitality, Smythe Manufacturing was ordered to resume operations and reinstate laid off employees at its Connecticut facility, which it had closed without first bargaining with the union).

[17]We note, however, that in *Division 587, Amalgamated Transit Union v. Metropolitan Seattle,* 663 F.2d 875 (9th Cir. 1981), the court held that the interest arbitration provisions within Metro's contract with the union, which complied with the requirement of § 13(c) of the Urban Mass Transportation Act of 1964 (49 U.S.C. §§ 1601 *et seq.*), did not conflict with Washington law and, hence, were enforceable. Neither party has cited this case, despite the fact that appellant's counsel represented Metro in the litigation. We do not find this case controlling, however. The issue of PERC's implied power to order interest arbitration is significantly different than the legality of an interest arbitration provision in a labor contract which is required by federal law as a condition of receipt of federal funds.

[18]*See also* RCW 41.58.020, which states in part:

"(1) It shall be the duty of the commission, in order to prevent or minimize interruptions growing out of labor disputes, to assist employers and employees to settle such disputes through mediation and fact–finding.

RCW 41.56.905 directs the provisions of the chapter to be liberally construed to accomplish their purposes, an agency has only those powers either expressly granted or necessarily implied from statutory grants of authority.[19] Moreover, an agency cannot alter or amend a statute by interpretation.[20]

 The history behind enactment of interest arbitration procedures shows that PERC has no implied power to order such arbitration as a remedy. Prior to 1973, public bodies had no authority to engage in or agree to interest arbitration.[21] The 1973 amendments to RCW Title 41, however, authorized interest arbitration in certain cases. RCW 41.56.430 states:

> The intent and purpose of this 1973 amendatory act [which included RCW 41.56.430 through RCW 41.56.490] is to recognize that there exists a public policy in the state of Washington against strikes by *uniformed personnel* as a means of settling their labor disputes; that the uninterrupted and dedicated service of these classes of employees is vital to the welfare and public safety of the state of Washington; that to promote such dedicated and uninterrupted public service there should exist an effective and adequate alternative means of settling disputes.

(Italics ours.)

---

" . . . .

"(3) If the director is not able to bring the parties to agreement by mediation within a reasonable time, he shall seek to induce the parties to voluntarily seek other means of settling the dispute without resort to strike or other coercion, including submission to the employees in the bargaining unit of the employer's last offer of settlement for approval or rejection in a secret ballot. The failure or refusal of either party to agree to any procedure suggested by the director shall not be deemed a violation of any duty or obligation imposed by this chapter."

[19]*Green River Comm'ty College v. Higher Educ. Personnel Bd.*, 95 Wn.2d 108, 112, 622 P.2d 826 (1980), *adhered to and modified on reconsideration*, 95 Wn.2d 962, 633 P.2d 1324 (1981).

[20]*Burlington Northern, Inc. v. Johnston*, 89 Wn.2d 321, 572 P.2d 1085 (1977).

[21]*See State ex rel. Everett Fire Fighters, Local 350 v. Johnson*, 46 Wn.2d 114, 278 P.2d 662 (1955) (holding that an initiative permitting interest arbitration with fire fighters was an improper delegation of the legislative duty to fix wages, hours and working conditions for municipal employees).

As indicated by the statute, the interest arbitration scheme of RCW 41.56.430–.490 applies to "uniformed personnel." Under RCW 41.56.030(7), "uniformed personnel" include certain law enforcement officers and fire fighters. The statute plainly means that interest arbitration procedures are to apply only to uniformed personnel. Significantly, even the extension of interest arbitration to additional uniformed personnel has been achieved by specific legislation.[22] By specifically identifying uniformed personnel within RCW 41.56.430, the Legislature clearly intended that interest arbitration should not be applied in negotiations with other public employees.[23]

The Legislature's enactment of interest arbitration procedures which apply only to certain uniformed personnel was intended to prevent the potentially acute harm which might be caused by strikes by these public employees.[24] A strike by Metro's commuter pool employees poses no such threat of harm. Interest arbitration, even where permitted by statute, must be by mutual consent of the parties. When imposed by an arbitrator over a party's objection, an interest arbitration provision is unenforceable.[25]

PERC's remedial powers under RCW 41.56.160 do not include ordering interest arbitration, application of which is

---

[22]*See* RCW 41.56.475 (Washington State Patrol Officers); RCW 41.56.495 (advanced life support technicians).

[23]Where a statute specifically designates the things upon which it operates, there is an inference that the Legislature intended all omissions. *In re Eaton,* 110 Wn.2d 892, 898, 757 P.2d 961 (1988); *Queets Band of Indians v. State,* 102 Wn.2d 1, 4–5, 682 P.2d 909 (1984).

[24]*Nucleonics Alliance, Local Union 1–369 v. WPPSS,* 101 Wn.2d 24, 34, 677 P.2d 108 (1984); *Yakima Cy. Deputy Sheriff's Ass'n v. Board of Comm'rs,* 92 Wn.2d 831, 838–39, 601 P.2d 936 (1979), *appeal dismissed,* 446 U.S. 979 (1980); *Spokane v. Spokane Police Guild,* 87 Wn.2d 457, 462, 553 P.2d 1316 (1976).

[25]*Klauder v. San Juan Cy. Deputy Sheriffs' Guild,* 107 Wn.2d 338, 344, 728 P.2d 1044 (1986).

unlawful absent specific legislative authority.[26] Accordingly, the portion of PERC's order directing the parties to engage in interest arbitration if bargaining fails exceeds its authority and must be deleted.

## ATTORNEY FEES

■ Local 17 seeks attorney fees on appeal. Attorney fees may be awarded only when there is a contractual, statutory, or recognized equitable basis.[27] In *Washington Fed'n of State Employees v. Community College Dist. 17*, 93 Wn.2d 60, 69, 605 P.2d 1252 (1980), the court wrote:

> We hold that RCW 41.56.160 is broad enough to permit a remedial order containing an award of litigation expenses when that is necessary to make the order effective. Such an allowance is not automatic, but should be reserved for cases in which a defense to the unfair labor practice charge can be characterized as frivolous or meritless. The term "meritless" has been defined as meaning groundless or without foundation. . . . Awards should not be permitted routinely, simply because the charging party prevails.

(Footnote omitted.) Although fees were properly awarded by PERC, Metro has here correctly contended that PERC should not have used interest arbitration as a remedy. Its appeal has merit. Hence, Local 17 is not entitled to fees on appeal.

■ Metro has failed to properly argue and cite supporting authority for the remaining issues raised. They will not be considered on appeal.[28]

---

[26]*Spokane v. Spokane Police Guild*, 87 Wn.2d 457, 553 P.2d 1316 (1976); *State ex rel. Everett Fire Fighters, Local 350 v. Johnson*, 46 Wn.2d 114, 278 P.2d 662 (1955).

[27]*Miotke v. Spokane*, 101 Wn.2d 307, 328, 678 P.2d 803 (1984).

[28]*See* RAP 10.3(a)(5); *BC Tire Corp. v. GTE Directories Corp.*, 46 Wn. App. 351, 355, 730 P.2d 726 (1986), *review denied*, 108 Wn.2d 1013 (1987).

Reversed in part and remanded for further proceedings consistent with this opinion.

GROSSE, C.J., and DEIERLEIN, J. Pro Tem., concur.

Review granted at 116 Wn.2d 1017 (1991).