[No. 57935-1.   En Banc.   March 12, 1992.]

THE MUNICIPALITY OF METROPOLITAN SEATTLE, *Respondent,*
v. THE PUBLIC EMPLOYMENT RELATIONS COMMISSION,
ET AL, *Petitioners.*

622

*Kenneth O. Eikenberry, Attorney General,* and *Richard A. Heath, Senior Assistant,* for petitioner Public Employment Relations Commission.

*Richard D. Eadie,* for petitioner International Federation of Professional and Technical Engineers.

*Preston Thorgrimson Shidler Gates & Ellis,* by *J. Markham Marshall,* for respondent.

ANDERSEN, J. —

## FACTS OF CASE

The question raised by this appeal is whether the Public Employment Relations Commission (PERC) has authority to order "interest" arbitration as part of an unfair labor practice remedy. We hold that, in limited circumstances, it does.

The PERC order challenged in this action requires the employer, Municipality of Metropolitan Seattle (Metro), to participate in interest arbitration if collective bargaining between Metro and the International Federation of Professional and Technical Engineers, Local 17, AFL-CIO (Local 17) does not result in a collective bargaining agreement.

"Interest" (or contract) arbitration differs from the more familiar "grievance" arbitration. Grievance arbitration requires the employer and union to submit unresolved disputes regarding the interpretation or application of an *existing* collective bargaining contract to an objective arbitrator.[1] Interest arbitration, on the other hand, occurs only at a point where an impasse has been reached in new contract negotiations. At that point, the unresolved items of the new collective bargaining agreement are submitted to an arbitrator who then decides the terms of the *future* collective bargaining contract.[2]

This case concerns five employees who, until April 1984, worked as clerical employees for the City of Seattle's commuter pool. The city employees were represented by their exclusive bargaining agent, Local 17.

In 1982 or 1983, Metro, a public transit authority serving the greater Seattle area, began negotiating with the City of Seattle for a transfer of the City's commuter pool program to Metro. The plan involved the transfer of approximately 29 employees, including the 5 clerical employees who were members of Local 17. The statute authorizing such transfers[3] places certain obligations, including the duty to collectively bargain with existing unions, upon any metropolitan

---

[1] *See Klauder v. San Juan Cy. Deputy Sheriffs' Guild*, 107 Wn.2d 338, 342, 728 P.2d 1044 (1986).

[2] *See generally Klauder*, 107 Wn.2d at 342; LaRue, *An Historical Overview of Interest Arbitration in the United States*, 42 Arb. J. 13, 14 (Dec. 1987); Morris, *The Role of Interest Arbitration in a Collective Bargaining System*, 1 Indus. Rel. L.J. 427, 428 (1976); O'Reilly, *Alternative Dispute Resolution under the NLRA: Devaluation of the Strike*, 6 Lab. Law. 133, 139 (1990).

[3] RCW 35.58.240.

corporation which acquires an existing transportation system.[4] The statute provides:

> If a metropolitan municipal corporation shall perform the metropolitan transportation function and shall acquire any existing transportation system, *it shall assume and observe all existing labor contracts relating to such system* and, to the extent necessary for operation of facilities, all of the employees of such acquired transportation system whose duties are necessary to operate efficiently the facilities acquired shall be appointed to comparable positions to those which they held at the time of such transfer, and no employee or retired or pensioned employee of such systems shall be placed in any worse position with respect to pension seniority, wages, sick leave, vacation or other benefits that he enjoyed as an employee of such system prior to such acquisition. *The metropolitan municipal corporation shall engage in collective bargaining with the duly appointed representatives of any employee labor organization having existing contracts with the acquired transportation system and may enter into labor contracts with such employee labor organization.*

(Italics ours.) RCW 35.58.265.

As evidenced by an internal staff proposal, Metro was well aware of this section of the law at least as early as April 1983, a full year before the actual transfer of the city employees occurred. In that staff proposal, Metro recognized that the five commuter pool employees belonged to Local 17, a union not otherwise involved with Metro. The staff proposal quotes from the above statute and then states:[5]

> Thus, those Commuter Pool employees would have the right to retain their union membership and have Metro engage in collective bargaining with their union representative. Hence, transfer of Commuter Pool to Metro would probably add another bargaining unit which Metro would have to work with and bargain with. This is not a major problem.
>
> Metro staff does not see any substantial labor relations issues or concerns associated with the transfer of Commuter Pool. Effectuating the transfer will not adversely impact existing transit employees. Nor is there any provision in our existing transit collective bargaining agreements which would preclude or be impacted by the transfer. As noted earlier, several other transit organizations nationally are also involved

---

[4]*See* RCW 35.58.265.

[5]Supplemental Clerk's Papers, at 766.

in ridesharing activities without major labor relations implications.

The transfer agreement executed by the City of Seattle and Metro in April 1984 provided in part:[6]

> Metro shall succeed to the City's obligations under its collective bargaining agreement with . . . Local 17 as to the represented employees transferred.

The five commuter pool employees were transferred to Metro in early April 1984. In the years from the date of that transfer to the present time, Metro has refused to recognize Local 17 as the appropriate bargaining unit for the transferred employees. During those years, Metro has also refused to bargain with the union, despite court and PERC orders to do so.

Two related actions preceded this one. In each action Metro's argument that it was not required to bargain with Local 17 was rejected.

In the first action, initiated in September 1984, Metro filed a unit clarification petition with PERC, asking PERC to find that the five transferred employees belonged to the bargaining unit represented by Local 587 of the Amalgamated Transit Union. Approximately 2,800 Metro workers were represented by Local 587. Although Local 587 was named as a party to the unit clarification case, it declined to actively participate in the proceeding and has never claimed to represent the five clerical employees. The executive director of PERC ruled against Metro[7] and dismissed the unit clarification petition, finding that Local 17 was the exclusive bargaining representative of the five commuter pool employees. The director found Metro advanced a "significantly different interpretation" of the law and the transfer agreement during the unit clarification action than it had in

---

[6]Supplemental Clerk's Papers, at 121.

[7]*International Fed'n of Professional & Technical Eng'rs, Local 17 v. Municipality of Metro Seattle*, Pub. Empl. Relations Comm'n Dec. 2358 PECB, *aff'd sub nom. Municipality of Metro Seattle v. Amalgamated Transit Union Local 587*, Pub. Empl. Relations Comm'n Dec. 2358-A PECB (1986).

April of 1984, the date of the transfer,[8] and also found Metro's interpretation of the agreement "beyond credibility".[9]

Metro appealed the ruling to the full Commission and the ruling was affirmed.[10] Metro then appealed PERC's decision to the Superior Court which, in turn, also affirmed PERC.

In the second action, Local 17 filed a complaint in the Superior Court for King County; it asked for an order requiring Metro to comply with the terms of the transfer agreement between it and the City. The trial court enjoined Metro from refusing to bargain with Local 17. The trial court also ordered Metro to pay Local 17's attorneys' fees in the amount of $30,202.50. The award of fees was based on a finding of bad faith on the part of Metro.

Both of these superior court decisions were appealed by Metro and in due course were affirmed by the Court of Appeals in an unpublished opinion.[11]

In February 1985 Local 17 filed the unfair labor practice complaint that resulted in the appeal before us. Local 17's complaint alleged a refusal to bargain on the part of Metro. Although the hearing on the unfair labor practice complaint was held in early November 1986, the decision was not issued until January 1988.[12] The delay was due to PERC's

---

[8]*International Fed'n of Professional & Technical Eng'rs, Local 17 v. Municipality of Metro Seattle*, Pub. Empl. Relations Comm'n Dec. 2358 PECB (1986), at 20.

[9]*International Fed'n of Professional & Technical Eng'rs, Local 17 v. Municipality of Metro Seattle*, Pub. Empl. Relations Comm'n Dec. 2358 PECB (1986), at 21.

[10]*Municipality of Metro Seattle v. Amalgamated Transit Union Local 587*, Pub. Empl. Relations Comm'n Dec. 2358-A PECB (1986).

[11]*Public Empl. Relations Comm'n v. Municipality of Metro Seattle*, 55 Wn. App. 1039 (1989).

[12]*International Fed'n of Professional & Technical Eng'rs, Local 17 v. Municipality of Metro Seattle*, Pub. Empl. Relations Comm'n Dec. 2845 PECB, *aff'd*, Pub. Empl. Relations Comm'n Dec. 2845-A PECB (1988).

decision to hold the matter in abeyance until a decision was reached by the King County Superior Court in Metro's unit clarification action. In the unfair labor practice case, Metro argued that it had changed its operations to such an extent that the commuter pool which was transferred from the City was no longer intact and thus no longer existed as a separate bargaining unit. The PERC hearing examiner found this argument to be "frivolous" in light of settled law requiring that the "effects" of such significant changes in working conditions must be bargained before being implemented. The hearing examiner noted that during the pendency of the action, and after the previous unit clarification petition had been dismissed, Metro had filed yet another petition with PERC asking that its bargaining obligations toward Local 17 be terminated. The hearing examiner found:

> METRO has attempted at every turn to evade its bargaining obligations. It is evident that METRO has not given up the fight, and that it is still not prepared to fulfill its bargaining obligations towards Local 17. . . . METRO will likely continue to put up one defense after another in an ongoing attempt to defeat having a bargaining relationship with Local 17.

*International Fed'n of Professional & Technical Eng'rs, Local 17 v. Municipality of Metro Seattle*, Pub. Empl. Relations Comm'n Dec. 2845 PECB (1988), at 10-11.

The hearing examiner concluded:

> METRO has asserted, and continues to assert, *inherently frivolous defenses* in an ongoing effort to subvert and avoid its bargaining obligations towards Local 17.

(Italics ours.) *International Fed'n of Professional & Technical Eng'rs, Local 17 v. Municipality of Metro Seattle*, Pub. Empl. Relations Comm'n Dec. 2845 PECB (1988), at 23.

The hearing examiner then crafted the order which is now before us on Metro's challenge. The order requires Metro to restore the status quo with respect to the five commuter pool employees and to make those employees whole. Based on a finding of bad faith on the part of Metro, it requires Metro to pay the union's reasonable attorneys'

fees and costs. It orders Metro to post notices with respect to the unfair labor practice and orders that Metro

(d) Upon request, bargain collectively in good faith with . . . Local 17, with respect to all subjects of bargaining as described in Chapter 41.56 RCW for the clerical commuter pool employees in the bargaining unit established by the Commission and the Superior Court of King County, Washington.

(e) If no agreement is reached through bilateral negotiations within sixty (60) days after Local 17 has requested to bargain, either party may request the Public Employment Commission Relations [*sic*] to provide the services of a mediator to assist the parties. If no agreement is reached by using the mediation process, and the Executive Director, on the request of either of the parties and the recommendation of the assigned mediator, concludes that the parties are at impasse following a reasonable period of negotiations, shall submit the remaining issues to interest arbitration using the procedures of 41.56.450, *et seq*, and the standards for . . . firefighters. *The decision of the neutral arbitration panel shall be final and binding upon both the parties.*

(Italics ours.) *International Fed'n of Professional & Technical Eng'rs, Local 17 v. Municipality of Metro Seattle*, Pub. Empl. Relations Comm'n Dec. 2845 PECB (1988), at 25.

Metro appealed the decision and the full Commission affirmed[13] but held that the award of such an extraordinary remedy should be very limited. As the Commission declared in this regard:

We find that, with a . . . limitation making its imposition appropriate only in those cases where there is a showing of frivolity and/or recalcitrance on the part of the unfair labor practice violator, our imposition of interest arbitration as an extraordinary remedy will effectuate the legislative purpose of maintaining labor peace. Such a limitation, we feel, supports and validates the heretofore unrecognized remedy of imposition of interest arbitration. By this decision, we have no intention of adopting interest arbitration as a common remedy, or as one that will be frequently imposed for typical unfair labor practices. The remedy is being imposed here because of METRO's repeated efforts to subvert the bargaining process, the entire pattern of which is set forth in detail in the Examiner's decision.

---

[13]*International Fed'n of Professional & Technical Eng'rs, Local 17 v. Municipality of Metro Seattle*, Pub. Empl. Relations Comm'n Dec. 2845-A PECB (1988).

*International Fed'n of Professional & Technical Eng'rs, Local 17 v. Municipality of Metro Seattle*, Pub. Empl. Relations Comm'n Dec. 2845-A PECB (1988), at 23.

Metro appealed the PERC decision to the Superior Court for King County which affirmed. The case was then appealed to the Court of Appeals. On appeal, Metro challenged the PERC order on the grounds that (1) PERC did not have the authority to order Metro to return its employees to the status quo that existed in August 1984 (6 months before the unfair labor practice complaint was filed) and (2) PERC did not have authority to order interest arbitration as an unfair labor practice remedy. The Court of Appeals affirmed the order requiring restoration of the status quo but reversed that portion of the order directing interest arbitration in the event of bargaining impasse.[14]

PERC and Local 17 petitioned this court for review of the interest arbitration issue; we granted the petition.

One issue is before us.

### ISSUE

Does the Public Employment Relations Commission (PERC) have authority to order an employer to participate in interest arbitration, if collective bargaining negotiations between the employer and its employees do not result in a collective bargaining agreement?

### DECISION

CONCLUSION. PERC does have the authority, in limited and extraordinary circumstances, to order interest arbitration as part of an unfair labor practice remedy. Such a remedy must be cautiously and sparingly used, however, and used only in those cases where there is a clear history of bad faith refusal to bargain and where there is a very strong likelihood that such refusal will continue despite PERC's order to bargain in good faith.

---

[14]*Municipality of Metro Seattle v. Public Empl. Relations Comm'n*, 60 Wn. App. 232, 803 P.2d 41 (1991). The decision of the Court of Appeals with respect to the status quo issue is not before this court.

This case presents a conflict between the need to preserve the integrity of the collective bargaining process on the one hand, and, on the other, the genuine need to remedy flagrant abuses of that process in situations where employees are unable, through legal means or by use of traditional economic weapons, to remedy the situation themselves.

The Public Employees' Collective Bargaining Act, RCW 41.56, was enacted in 1967,[15] in order to

> promote the continued improvement of the relationship between public employers and their employees by providing a uniform basis for implementing the right of public employees to join labor organizations of their own choosing and to be represented by such organizations in matters concerning their employment relations with public employers.

RCW 41.56.010.

The act requires public employers, including municipal corporations such as Metro, to participate in collective bargaining with the exclusive bargaining representatives of its employees. RCW 41.56.100.

Collective bargaining is defined by the act as

> the performance of the mutual obligations of the public employer and the exclusive bargaining representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to grievance procedures and collective negotiations on personnel matters, including wages, hours and working conditions, which may be peculiar to an appropriate bargaining unit of such public employer, *except that by such obligation neither party shall be compelled to agree to a proposal or be required to make a concession unless otherwise provided in this chapter.*

(Italics ours.) RCW 41.56.030(4).

Employers have traditionally not been *compelled* to agree or to accept the terms of a collective bargaining contract to which they do not agree.[16] Resolution of bargaining impasses has thus depended on the economic pressures that the

---

[15]Laws of 1967, 1st Ex. Sess., ch. 108, p. 1884.

[16]*See, e.g., H.K. Porter Co. v. NLRB*, 397 U.S. 99, 102, 25 L. Ed. 2d 146, 90 S. Ct. 821 (1970); *International Ass'n of Fire Fighters, Local 1445 v. Kelso*, 57 Wn. App. 721, 732, 790 P.2d 185 ("It is axiomatic that, in bargaining, the parties

employer and employees could bring to bear upon one another.[17]

Where those economic pressures can be limited or prohibited or where their usefulness is questionable, other — more peaceful — methods of resolving contract impasses may be advantageous.[18]

While interest arbitration is generally a voluntary process[19] both this court and the Legislature have given limited approval to the use of compulsory interest arbitration to resolve collective bargaining impasses in the public employment arena. RCW 41.56.450 requires interest arbitration between law enforcement and fire fighter unions and their employers when contract negotiations and mediation have failed to produce a contract.[20]

In *Green River Comm'ty College v. Higher Educ. Personnel Bd.*, 95 Wn.2d 108, 622 P.2d 826 (1980), *modified on reconsideration*, 95 Wn.2d 962, 633 P.2d 1324 (1981), this court approved a regulation promulgated by the Higher Education Personnel Board (HEP Board) that permitted either a college or its employee union to submit unresolved collective bargaining issues to the HEP Board for compulsory resolution through interest arbitration.

Heretofore we have not determined whether PERC has the power to order interest arbitration as a remedy for an unfair labor practice.

---

retain the power of decision and are not required to agree."), *review denied*, 115 Wn.2d 1010 (1990).

[17]*See generally* Morris, *The Role of Interest Arbitration in a Collective Bargaining System*, 1 Indus. Rel. L.J. 427 (1976).

[18]*See, e.g.*, O'Reilly, *Alternative Dispute Resolution under the NLRA: Devaluation of the Strike*, 6 Lab. Law. 133, 135 (1990).

[19]*See generally* Morris, *supra*.

[20]*See Spokane v. Spokane Police Guild*, 87 Wn.2d 457, 463-64, 553 P.2d 1316 (1976) (upholding the constitutionality of RCW 41.56.450).

■ An agency has only those powers which are expressly granted or which are necessarily implied from statutory grants of authority.[21]

PERC derives its power from RCW 41.58, the statute that creates the Commission, and from RCW 41.56, the Public Employees' Collective Bargaining Act.

The creation of the Commission was intended

to achieve more efficient and expert administration of public labor relations administration and to thereby ensure the public of quality public services.

RCW 41.58.005.

In addition to other duties, PERC

is empowered and directed to prevent any unfair labor practice and to issue appropriate remedial orders; . . .

RCW 41.56.160.

When interpreting the Public Employees' Collective Bargaining Act, we will liberally construe the act in order to accomplish its purpose.[22]

■ The purpose of the act "is to provide public employees with the right to join and be represented by labor organizations of their own choosing, and to provide for a uniform basis for implementing that right." (Footnotes omitted.) *Yakima v. International Ass'n of Fire Fighters, Local 469*, 117 Wn.2d 655, 670, 818 P.2d 1076 (1991).

■■ With that purpose in mind, we interpret the statutory phrase "appropriate remedial orders" to be those necessary to effectuate the purposes of the collective bargaining statute and to make PERC's lawful orders effective.[23] The

---

[21]*Green River Comm'ty College v. Higher Educ. Personnel Bd.*, 95 Wn.2d 108, 112, 622 P.2d 826 (1980), *modified on reconsideration*, 95 Wn.2d 962, 633 P.2d 1324 (1981).

[22]RCW 41.56.905; *Yakima v. International Ass'n of Fire Fighters, Local 469,* 117 Wn.2d 655, 670, 818 P.2d 1076 (1991); *PUD 1 v. Public Empl. Relations Comm'n*, 110 Wn.2d 114, 119, 750 P.2d 1240 (1988); *Roza Irrig. Dist. v. State*, 80 Wn.2d 633, 639, 497 P.2d 166 (1972).

[23]*See, e.g., State ex rel. Washington Fed'n of State Employees v. Board of Trustees*, 93 Wn.2d 60, 67-69, 605 P.2d 1252 (1980).

authority granted PERC by the remedial provision of the statute has been interpreted to be broad enough to authorize an award of attorney fees when such an award "is necessary to make the order effective and if the defense to the unfair labor practice is frivolous or meritless."[24]

In *State ex rel. Washington Fed'n of State Employees v. Board of Trustees*, 93 Wn.2d 60, 605 P.2d 1252 (1980), this court stated that the HEP Board's determination as to remedies under the Public Employees' Collective Bargaining Act should be accorded considerable judicial deference, and noted that the "relation of remedy to policy is peculiarly a matter of administrative competence."[25] PERC's expertise in resolving labor disputes also has been judicially recognized and accorded deference.[26]

Agencies enjoy substantial freedom in developing remedies. This court in *In re Case E-368*, 65 Wn.2d 22, 29, 395 P.2d 503 (1964) (quoting 2 Am. Jur. 2d *Administrative Law* § 672 (1962)) held:

> "Administrative agencies have considerable latitude to shape their remedies within the scope of their statutory authority, especially where a statute expressly authorizes the agency to require that such action be taken as will effectuate the purposes of the act being administered. The relation of remedy to policy is peculiarly one for the administrative agency and its special competence, at least the agency has the primary function in this regard. . . ."

PERC thus has authority to issue appropriate orders that it, in its expertise, believes are consistent with the purposes of the act,[27] and that are necessary to make its

---

[24]*Lewis Cy. v. Public Empl. Relations Comm'n*, 31 Wn. App. 853, 865-66, 644 P.2d 1231, *review denied*, 97 Wn.2d 1034 (1982). *See also Board of Trustees*, 93 Wn.2d at 69 ("remedial" action is broad enough to encompass the power to award attorney fees under appropriate circumstances).

[25]*Board of Trustees*, 93 Wn.2d at 68-69.

[26]*Public Empl. Relations Comm'n v. Kennewick*, 99 Wn.2d 832, 841-42, 664 P.2d 1240 (1983).

[27]*Board of Trustees*, 93 Wn.2d at 69.

orders effective unless such orders are otherwise unlawful.[28]

Metro argues that compulsory interest arbitration is unlawful unless statutorily mandated, that it is contrary to the policy underlying collective bargaining, and that it results in an unconstitutional delegation of Metro's legislative authority.

The Court of Appeals agreed with Metro when it held that interest arbitration "is unlawful absent specific legislative authority."[29]

However, most authorities agree that, unless otherwise prohibited, interest arbitration is legal, if it is *voluntarily* agreed upon by the parties.[30]

It also is lawful if required by statute.[31] RCW 41.56.450 mandates interest arbitration for fire fighters and law enforcement officers. Metro argues that because the Legislature did not include transit workers within the interest arbitration provisions of the statute, it intended that those workers not participate in interest arbitration.

This argument ignores the impact of *Green River Comm'ty College v. Higher Educ. Personnel Bd.*, 95 Wn.2d 108, 622 P.2d 826 (1980), *modified on reconsideration*, 95 Wn.2d 962, 633 P.2d 1324 (1981). Many of the arguments here presented by Metro were considered in *Green River*,[32] where this court rejected those arguments and ruled that the HEP Board, through its regulatory powers, could

---

[28]*Board of Trustees*, 93 Wn.2d at 69; *Lewis Cy. v. Public Empl. Relations Comm'n*, 31 Wn. App. 853, 865, 644 P.2d 1231, *review denied*, 97 Wn.2d 1034 (1982).

[29]*Municipality of Metro Seattle v. Public Empl. Relations Comm'n*, 60 Wn. App. 232, 243-44, 803 P.2d 41 (1991).

[30]*See* Morris, 1 Indus. Rel. L.J. at 427-28; Datz, *Alternative Dispute Resolution — Interest Arbitration and the National Labor Relations Act*, 6 Lab. Law. 127 (1990); *Green River*, 95 Wn.2d at 123 (Brachtenbach, J., dissenting).

[31]*Spokane v. Spokane Police Guild*, 87 Wn.2d 457, 464, 553 P.2d 1316 (1976).

[32]*See Green River*, 95 Wn.2d at 121-23 (Brachtenbach, J., dissenting).

require all public colleges and their employees to participate in interest arbitration, if collective bargaining and contract mediation failed. This court found such a regulation to be consistent with the intent and purpose of the law governing collective bargaining between public colleges and their employees.[33]

The *Green River* court distinguished significant federal precedent that is now relied on by Metro. In *Green River*, this court declined to follow *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 25 L. Ed. 2d 146, 90 S. Ct. 821 (1970), a United States Supreme Court case that held the NLRB did not have authority to require a particular provision be included in a collective bargaining agreement. This court, in distinguishing *H.K. Porter Co.*, stated that

> reliance on NLRA precedents in the present context is inappropriate. The NLRA regulates labor relations only in the private sector. The act specifically guarantees employees the right to strike. Private sector bargaining and public sector bargaining are radically different, as both parties agree.

(Citations omitted.) *Green River*, 95 Wn.2d at 120.

■ *Green River* supports the union's and PERC's position that interest arbitration need not be specifically permitted or required by statute in order for it to be lawful.

Metro also argues that compelled interest arbitration is contrary to traditional collective bargaining principles and to the philosophy behind collective bargaining.

When faced with a situation such as that which exists here, there is little that a union can legally do to enforce the collective bargaining rights of its members. For 7 years Metro has been involved in litigation over the representation rights of these five employees. Court orders and financial sanctions have had no effect on Metro. The employer's delays and legal maneuvering have, in fact, resulted in a prolonged period in which the employees have not had an opportunity to negotiate the terms and conditions of their employment. During this time Metro accomplished the dispersion of the employees represented by Local 17 so that

---

[33]*Green River*, 95 Wn.2d at 118-19.

the bargaining unit became unidentifiable. This dispersion of employees throughout other bargaining units was the reason for PERC's order requiring a return to the status quo.

The conflict here thus arises because the employer in this case has been able to use the law to avoid its clear obligation to collectively bargain with the union and now, when ordered to participate in interest arbitration, claims that such an order is violative of the philosophy behind collective bargaining.

In this case PERC specifically found that the remedy of interest arbitration, upon impasse, was necessary to make its order to bargain effective. In the very limited circumstances presented by the facts of this case, such an order is not contrary to collective bargaining principles. Instead, it serves as an impetus to successfully negotiate an agreement.[34]

Here, PERC did not simply order the parties to participate in interest arbitration. Rather, PERC ordered Metro to recognize and bargain with Local 17. If bargaining does not begin, or if it does not result in an agreement within 60 days, then either party can ask for mediation. If mediation does not aid the parties in reaching an agreement, then and only then may interest arbitration be required.

Based on Metro's conduct with regard to Local 17, we conclude that the interest arbitration order *in this case* is not contrary to the purpose of the collective bargaining statute or to the concept of collective bargaining between public employers and their employees as it has progressed in this state.

---

[34]*See, e.g.,* Meizlish, *Surface Bargaining: A Problem in Need of a Remedy,* 1985 Det. C.L. Rev. 721, 728-29 ("Where all parties are put on notice that a failure to reach agreement will result in a third party imposing a solution, there is a strong likelihood that serious bargaining will ensue.") *See also H.K. Porter Co. v. NLRB,* 397 U.S. 99, 110-11, 25 L. Ed. 2d 146, 90 S. Ct. 821 (1970) (Douglas, J., dissenting) (compelling an employer to accept a contract term should be permitted in those narrow and specialized circumstances where refusal to bargain in good faith is aimed solely at avoidance of any agreement).

Metro also claims that PERC's order is unlawful because it requires an unconstitutional delegation of Metro's authority to ultimately decide the conditions of employment for its workers.

In a companion case,[35] we held that Metro has the statutory authority to voluntarily agree to participate in interest arbitration and that the participation of Metro in interest arbitration does not constitute an unconstitutional delegation of authority.

█ Under the broad powers granted to Metro, both under the Public Employees' Collective Bargaining Act, RCW 41.56, and the statute authorizing the creation of metropolitan municipalities, RCW 35.58, Metro has the authority to participate in interest arbitration, either voluntarily or if compelled by PERC. Where sufficient guidelines and procedural safeguards are provided,[36] as they are here,[37] we perceive no reason why *voluntary* participation in interest arbitration would be constitutionally permissible in the companion case, while *compulsory* participation in the same process would be impermissible in this one.

The nondelegation doctrine is not violated by PERC's order.

█ In sum, we hold that PERC acted within its statutory authority when it ordered interest arbitration in the event impasse occurs in this case. However, we specifically admonish that it should rarely be used as an enforcement tool. The remedy should be limited to cases like this one where there is a clear history of bad faith refusal to bargain and where there is a very strong likelihood that such refusal will continue, despite PERC's order to bargain in good faith. That portion of the Court of Appeals decision

---

[35]*Municipality of Metro Seattle v. Division 587, Amalgamated Transit Union*, 118 Wn.2d 639, 826 P.2d 167 (1992).

[36]*See Barry & Barry, Inc. v. Department of Motor Vehicles*, 81 Wn.2d 155, 158-59, 500 P.2d 540 (1972), *appeal dismissed*, 410 U.S. 977 (1973).

[37]PERC's order requires compliance with the statutory procedure set forth in RCW 41.56.450.

holding that PERC did not have authority to order interest arbitration is reversed; the order of the Superior Court affirming PERC's decision is reinstated in its entirety.

DORE, C.J., and UTTER, BRACHTENBACH, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.