[No. 58065-1.   En Banc.   March 12, 1992.]

THE MUNICIPALITY OF METROPOLITAN SEATTLE, *Appellant*, v. DIVISION 587, AMALGAMATED TRANSIT UNION, *Respondent*.

640

*Preston Thorgrimson Shidler Gates & Ellis*, by *Robin L. Nielsen* and *Thomas E. Kelly, Jr.*, for appellant.

*Frank & Rosen*, by *Clifford Freed* and *Jon Howard Rosen*, for respondent.

DURHAM, J. — As part of the collective bargaining process between the Municipality of Metropolitan Seattle (Metro) and Division 587 of the Amalgamated Transit Union (the Union), the parties agreed to submit labor disputes to binding interest arbitration at the request of either party. Metro now claims that this agreement constituted an illegal delegation of its legislative powers, and it sought a declaratory judgment. The trial court found in favor of the Union, and Metro appealed directly to this court. We affirm.

Metro is a metropolitan corporation organized pursuant to RCW 35.58. Metro is empowered:

> To fix the salaries, wages and other compensation of all officers and employees of the metropolitan municipal corporation unless the same shall be otherwise fixed in this chapter.

RCW 35.58.350(3). In addition, Metro has the authority to bargain with the Union under the Public Employees' Collective Bargaining Act (PECBA), RCW 41.56.

■ In 1976, Metro signed a model "Section 13(c)" agreement with the Union which included language providing for interest arbitration.[1] In 1980, an additional agreement was negotiated by Metro and the Union. Paragraph 15 of that agreement states, in part:

> In the case of any labor dispute involving the application, interpretation or enforcement of any of the provisions of this agreement . . . which cannot be settled by the parties within thirty (30) days, the same may be submitted at the written

---

[1] "Section 13(c)" is part of the Urban Mass Transportation Act of 1964 (UMTA), 49 U.S.C. app. § 1609(c), which provides significant federal funding to municipalities operating transit systems. Section 13(c) mandates that provisions must be made to protect the collective bargaining rights of transportation employees. See *infra*.

request of either party to a board of arbitration selected in accordance with the existing collective bargaining agreement . . . The term "labor dispute" shall be broadly construed and shall include any controversy concerning wages, salaries, working conditions or benefits, including health and welfare, sick leave, insurance, or pension and retirement provisions, the making or maintaining of collective bargaining agreements, the terms to be included in such agreements, and the interpretation or application of such collective bargaining agreements, the adjustment of grievances, and any controversy arising out of or by virtue of any provisions of this agreement.

Clerk's Papers, at 66-67. This clause provides for interest arbitration, as well as grievance arbitration. Interest arbitration is a process to determine the terms of a collective bargaining agreement itself, that is, to set the terms of the contract between the parties. *Klauder v. San Juan Cy. Deputy Sheriffs' Guild*, 107 Wn.2d 338, 339, 728 P.2d 1044 (1986). It is distinct from grievance arbitration, which is a process involving the resolution of a specific dispute arising from an existing collective bargaining agreement.

In December 1990, after several months of bargaining, the Union notified Metro that it was submitting all disputed issues to interest arbitration. Metro filed an action seeking a declaratory judgment with the King County Superior Court on December 21, 1990. On March 4, 1991, a declaratory judgment was entered stating that under state law, Metro "is authorized to enter into, participate in, and comply with the interest arbitration provision . . .". Metro appealed directly to this court, and the case was retained and set as a companion case to *Municipality of Metro Seattle v. Public Empl. Relations Comm'n*, 118 Wn.2d 621, 826 P.2d 158 (1992).

Metro has received hundreds of millions of dollars from the federal government under the Urban Mass Transportation Act of 1964 (UMTA). These funds have been disbursed to Metro in reliance on its assertions that it was bound by the 1980 agreement. Moreover, in 1980, the parties here submitted to interest arbitration, although they ultimately settled prior to the arbitrator's decision. In addition, the

Ninth Circuit has previously considered whether interest arbitration is authorized by RCW 35.58. *Division 587, Amalgamated Transit Union v. Municipality of Metro Seattle*, 663 F.2d 875 (9th Cir. 1981). The court held that Metro had the authority to enter into the agreement.

In this action, Metro argues that the interest arbitration clause, paragraph 15, is unenforceable because Metro lacked the statutory authority to enter into such an agreement. It claims that the agreement is an improper delegation of its power.

■ Where the Legislature enacts enabling legislation which vests a municipal corporation or similar entity with legislative powers, that body may not delegate its power absent specific statutory authorization. *Lutz v. Longview*, 83 Wn.2d 566, 570, 520 P.2d 1374 (1974); *Roehl v. PUD 1*, 43 Wn.2d 214, 240, 261 P.2d 92 (1953). If the statute specifically places certain duties or powers under the control of the municipal corporation, those powers may not be delegated. *Lake Wash. Sch. Dist. 414 v. Lake Wash. Educ. Ass'n*, 109 Wn.2d 427, 431, 745 P.2d 504, 757 P.2d 533 (1987). Thus, a municipal corporation's powers are limited to powers granted expressly in the statute, and powers which are "necessarily or fairly implied in or incident to the powers expressly granted, and also those essential to the declared objects and purposes of the corporation." *Port of Seattle v. State Utils. & Transp. Comm'n*, 92 Wn.2d 789, 794-95, 597 P.2d 383 (1979), *quoted in Tacoma v. Taxpayers*, 108 Wn.2d 679, 692, 743 P.2d 793 (1987); *Noe v. Edmonds Sch. Dist. 15*, 83 Wn.2d 97, 103, 515 P.2d 977 (1973).

RCW 35.58.350 vests all powers of Metro in the metropolitan council unless otherwise expressly vested in a specific board or commission. The council is empowered to:

> fix the salaries, wages and other compensation of all officers and employees of the metropolitan municipal corporation unless the same shall be otherwise fixed in this chapter.

RCW 35.58.350(3). A broad grant of authority is also given:

> In addition to the powers specifically granted by this chapter a metropolitan municipal corporation shall have all powers

which are necessary to carry out the purposes of the metropolitan municipal corporation and to perform authorized metropolitan functions.

RCW 35.58.180. This includes the power to enter into contracts for operating municipal services "on such terms as may be agreed upon by the contracting parties". RCW 35.58.180. In addition, Metro has "all powers necessary to comply with any criteria, standards, and regulations which may be adopted under the urban mass transportation act . . .". RCW 35.58.2794.

Moreover, Metro is required to engage in the collective bargaining process. RCW 41.56.100. Municipal corporations are public employers, and subject to the PECBA. RCW 41.56-.030(1); RCW 41.56.020. "Collective bargaining" is defined as:

> the performance of the mutual obligations of the public employer and the exclusive bargaining representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to grievance procedures and collective negotiations on personnel matters, including wages, hours and working conditions, which may be peculiar to an appropriate bargaining unit of such public employer . . ..

RCW 41.56.030(4).

The statutory provisions involved here must be interpreted liberally. Metro's enabling legislation provides for liberal construction:

> The rule of strict construction shall have no application to this chapter, but the same shall be liberally construed in all respects in order to carry out the purposes and objects for which this chapter is intended.

RCW 35.58.900. The PECBA is also to be interpreted liberally to accomplish its purpose. RCW 41.56.905. Although in its previous form, this portion of the Act applied only to uniformed personnel, it was amended to apply to the entire PECBA. Laws of 1983, ch. 287, § 5. Thus, "a liberal construction should be given to all of RCW 41.56 and conflicts resolved in favor of the dominance of that chapter." *Rose v. Erickson*, 106 Wn.2d 420, 424, 721 P.2d 969 (1986).

■ Metro's powers to enter into contracts and to determine employee compensation, coupled with the requirement to engage in collective bargaining, necessarily implies the power to enter into agreements which are binding. Even absent liberal construction, the PECBA must be read to grant the authority to public employers to enter into agreements regarding wages. Metro freely agreed to the interest arbitration clause, and has relied on it to receive federal funds. The collective bargaining process entails the ability to agree to provisions which are not entirely beneficial to the municipality, and to give up the power to unilaterally set wages. Therefore, the enabling statute combined with the PECBA implies the power to enter into a binding agreement containing an interest arbitration clause.[2]

■■ When a municipal corporation acts as a business in a proprietary capacity, its powers are construed even more broadly. *Hite v. PUD 2*, 112 Wn.2d 456, 459, 772 P.2d 481 (1989); *Tacoma v. Taxpayers*, 108 Wn.2d 679, 694, 743 P.2d 793 (1987). The operation of utilities has been classified as a proprietary function. *Tacoma*, at 694 n.9. The operation of a transit system is similar. Indeed, Metro was formed to provide "essential services" to the population it serves, including garbage disposal, water supply, and transportation. RCW 35.58.010. These types of functions are more proprietary than governmental in nature.

■ ■ Actions taken pursuant to a proprietary function are authorized unless they are beyond the purposes of the statute, or contrary to an express statutory or constitutional provision. *Tacoma*, at 695.

---

[2]Courts in other jurisdictions have held that it was within the legislative authority of a municipality to agree to interest arbitration. *See, e.g., Stockton Metro Transit Dist. v. Amalgamated Transit Union, Local 276*, 132 Cal. App. 3d 203, 213, 183 Cal. Rptr. 24 (1982); *School Comm. v. Boston Teachers Union, Local 66*, 372 Mass. 605, 363 N.E.2d 485 (1977). Other jurisdictions have held contra. *See, e.g., Maryland Classified Employees Ass'n v. Anderson*, 281 Md. 496, 508-09, 380 A.2d 1032, 1039 (1977) (citing cases); *Transit Auth. v. Amalgamated Transit Union, Local 639*, 698 S.W.2d 520, 523 (Ky. 1985); *Local Div. 732, Amalgamated Transit Union v. Metropolitan Atlanta Rapid Transit Auth.*, 253 Ga. 219, 222, 320 S.E.2d 742, 745 (1984).

> Thus, if municipal utility actions come within the purpose and object of the enabling statute and no express limitations apply, this court leaves the choice of means used in operating the utility to the discretion of municipal authorities. We limit judicial review of municipal utility choices to whether the particular contract or action was arbitrary or capricious, or unreasonable.

(Citations omitted.) *Tacoma*, at 695. In particular, the power to enter contracts is very broad when a municipal corporation is engaged in business activity. *Hite*, at 460.

Here, acting in its proprietary capacity to operate a transit system, Metro entered into a contract with the Union. There are no allegations that the interest arbitration provision was arbitrary or unreasonable. No statute expressly prohibits such a clause.

In addition, the interest arbitration clause has a valid business purpose. Under the UMTA, such a clause satisfies the requirements of § 13(c), 49 U.S.C. app. § 1609(c), which provides:

> It shall be a condition of any assistance under section 1602 of this Appendix that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment . . ..

The agreement signed by Metro and the Union in 1976 was a model agreement utilized by the Department of Labor and designed to meet the requirements of § 13(c), as set forth in that department's regulations. 29 C.F.R. § 215.6(b). Unless this requirement was met, Metro could not receive any federal funds for transportation. Moreover, Metro was expressly authorized to comply with the provisions of the UMTA, and to take any necessary actions to meet UMTA's requirements. RCW 35.58.2794.

■ Metro correctly argues that the UMTA does not *require* interest arbitration provisions, so long as there is a "fair and equitable" collective bargaining agreement in place. *Amalgamated Transit Union Int'l v. Donovan*, 767 F.2d 939, 954-56 (D.C. Cir. 1985). The quoted portion of the UMTA was enacted to protect state public employees, and to ensure that transportation employees were afforded the protection available to private employees under federal labor law. *Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union*, 457 U.S. 15, 17, 72 L. Ed. 2d 639, 102 S. Ct. 2202 (1982). State labor relations law continues to control the relationship between a public employer and its transportation employees. *Jackson Transit*, at 24. A state may choose any scheme of collective bargaining with its public employees which is constitutionally permitted. However, federal funding may be jeopardized if § 13(c) is not satisfied. *Donovan*, at 947. Although Metro is correct that interest arbitration is not required, it is clearly one way to meet the § 13(c) provisions. Metro was empowered to comply with § 13(c), and was explicitly authorized to comply with regulations adopted under the UMTA. A valid business purpose — obtaining federal funds — was served by the agreement.

Metro also argues that interest arbitration has previously been found to be an unlawful delegation of a municipality's legislative authority, and relies on *State ex rel. Everett Fire Fighters, Local 350 v. Johnson*, 46 Wn.2d 114, 278 P.2d 662 (1955). There, an initiative was passed to amend the city charter to provide for interest arbitration. *Everett Fire Fighters*, at 115. The court held that because collective bargaining with public employees was not valid, the delegation of the authority to fix wages was invalid. *Everett Fire Fighters*, at 121. That case was overruled by the PECBA. *Spokane v. Spokane Police Guild*, 87 Wn.2d 457, 464, 553 P.2d 1316 (1976). Under the PECBA, "what was held unlawful in that case is now both lawful and mandatory." *Spokane*, at 464.[3]

---

[3]Metro argues that *Spokane* should be narrowly interpreted to apply only to uniformed personnel. Under a specific provision of the PECBA, RCW

Metro also contends that the absence of any express provisions granting interest arbitration indicates a legislative intent to prohibit it. The Legislature has not expressly provided for interest arbitration, but neither has it prohibited it. Many permissible topics are not expressly covered in the PECBA. In the absence of a legislative declaration, the parties are free to agree to interest arbitration.

■ ■ Finally, Metro argues that the delegation of its authority is unconstitutional. A delegation of legislative authority is constitutional if the Legislature (1) defines what is to be done and who is to do it; and (2) provides procedural safeguards. *Barry & Barry, Inc. v. Department of Motor Vehicles*, 81 Wn.2d 155, 158, 500 P.2d 540 (1972), *appeal dismissed*, 410 U.S. 977 (1973). Metro argues that there are insufficient procedural safeguards in the arbitration process here. We disagree. First, *Barry* applies to legislative functions. Metro's actions here, however, are in the service of proprietary functions. Second, adequate procedural safeguards are present. Under the contract, a panel of neutral arbitrators is to be selected from the American Arbitration Association. The court has inherent power to review the arbitration decision. *Department of Social & Health Servs. v. State Personnel Bd.*, 61 Wn. App. 778, 783, 812 P.2d 500 (1991). These limited procedures are sufficient. *See Auburn v. King Cy.*, 114 Wn.2d 447, 452, 788 P.2d 534 (1990).

We hold that Metro was implicitly authorized to enter into an agreement containing the interest arbitration provision. We therefore affirm the trial court.

DORE, C.J., and UTTER, BRACHTENBACH, ANDERSEN, SMITH, GUY, and JOHNSON, JJ., concur.

---

41.56.450, uniformed personnel (as defined in RCW 41.56.030(7)) have a right to interest arbitration. However, *Spokane* should not be so construed. *Everett Fire Fighters* was decided prior to any bargaining rights being granted to public employees. It was overruled by the enactment of the PECBA.