# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

LARRY COSTELLO and CHRISTY COSTELLO,

      Appellants,

   v.

TANNER ELECTRIC COOPERATIVE,

      Respondent.

No. 73060-6-I

DIVISION ONE

UNPUBLISHED

FILED: March 7, 2016

COX, J. — The Costellos, who are members of Tanner Electric Cooperative (Tanner), appeal the dismissal of their action against Tanner for allegedly withholding Cooperative records and imposing an unlawful monthly fee on members who opt out of its "smart meter" program. They also appeal orders granting Tanner summary judgment on its counterclaim for unpaid charges and penalties, and awarding attorney fees and costs. We affirm in part and reverse in part.

Tanner is a cooperative electrical utility organized under RCW 24.06. In 2009, Tanner decided to replace its members' electricity meters with "smart meters" that eliminate the need for meter reading. Because smart meters generate detailed information about members' electricity use, several Tanner members, including appellants Larry and Christy Costello, expressed privacy concerns. In response, Tanner created an opt-out policy allowing members to

keep their old meters if they paid a $23.33 monthly fee covering the cost of reading their meter.

The Costellos declined to participate in the smart meter program but refused to pay the opt-out fee between February 1, 2013 and October 15, 2013.

In May 2013, the Costellos filed this action, alleging that the opt-out fee unlawfully burdened their state constitutional right to privacy,[1] violated the Consumer Protection Act,[2] and violated a statutory prohibition on discrimination in the provision of utility services.[3] The complaint further alleged that, as members of Tanner, the Costellos were entitled to inspect books and records relating to the smart meter program. Tanner counterclaimed for unpaid charges, penalties, and interest. It also sought attorney fees and costs.

In October 2013, the Costellos paid all of their outstanding opt-out fees. A notice accompanying their payment stated that they did not concede the fee's validity and reserved the right to challenge it in this action.

In February 2014, Tanner moved for a protective order restricting the Costellos' access to certain information. In particular, Tanner sought to limit access to information protected by a confidentiality agreement between Tanner and the smart-meter vendor, Aclara Technologies, LLC. Supporting declarations and pleadings described the confidential information as "Aclara engineering and

---

[1] Article 1, Section 7 Wash. Const.; RCW 80.28.090-.100.

[2] RCW 19.86.

[3] RCW 49.60.

2

design data and information, drawings, security features, technical specifications and other proprietary information about Aclara's . . . metering equipment and communications software."[4] The information included Aclara's "research, development, trade secrets . . . and intellectual property" as well as information about Tanner's smart meter system and business that allegedly could adversely affect "Tanner's ability to protect member power usage data and personally identifying information" from disclosure.[5] Tanner argued that the proprietary nature of the information and the confidentiality agreement established the "good cause" necessary for a protective order under CR 26(c) and justified limiting disclosure to counsel and/or an independent expert. The Costellos argued that Tanner failed to demonstrate good cause and that any language restricting access to their attorney or expert should be removed so they could inspect the documents themselves.

The Costellos then moved for partial summary judgment on their claim for access to Tanner's books and records. Tanner moved for partial summary judgment on the Costellos other three claims under CR 12(c) and/or CR 56.

On March 21, 2014, the court granted partial summary judgment dismissing the Costellos' constitutional, discrimination, and CPA claims. The court dismissed the first two claims under CR 12 and the CPA claim under CR 56 and Haberman v. Washington Pub. Power Supply Sys., 109 Wn.2d 107, 171-72,

---

[4] Clerk's Papers at 1734.

[5] Id.

3

744 P.2d 1032 (1987), amended, 109 Wn.2d 107, 750 P.2d 254 (1988). The court denied the Costellos' motion for summary judgment on their access to records claim.

The court also granted Tanner a protective order restricting access to confidential information. The order states in pertinent part:

> a receiving Party may disclose Highly Confidential Documents or the information contained in such Documents only to the receiving Party's counsel of record in this Litigation, and/or to independent experts or consultants for the receiving Party who have signed the "Acknowledgment and Agreement to Be Bound."[6]

The order defines "Attorneys" as "counsel of record." The order further provides that "[a]ny party may apply . . . for a modification of the Protective Order." After the court entered the protective order, the Costellos' counsel withdrew and they proceeded pro se.

Tanner then moved for summary judgment on the Costellos' access to records claim. At the hearing on the motion, the Costellos argued that they were entitled to view the "highly confidential" documents under RCW 24.06.160, the corporate books and records statute. They further argued that Tanner had not shown good cause for the protective order and was abusing the "confidential" designation permitted by the order. Tanner's counsel responded that the Costellos' access to records claim was moot because Tanner had either provided, or stood ready to provide to counsel or an expert, the requested

---

[6] Clerk's Papers at 789-90.

records. When the court asked what effect the Costellos' current pro se status had under the protective order, Tanner's counsel replied:

> Well, it's very clear that the order was intended to allow access only to counsel, independent counsel and expert. We think you would have to revise it at your discretion, if you believe that it should be revised. . . . But we would – we don't think that they can make an end [run] around your order simply to allow Mr. Costello access to these records."[7]

The Costellos did not ask the court to modify the protective order. Instead, they argued that "in the plain language of the protective order, there are no specific constraints on us as the receiving party from having the highly confidential information."[8] The court then asked the Costellos whether they had an expert or legal training. The Costellos stated they had neither. When the court asked whether a consultant would be necessary to "effectuate the terms of the protective order,"[9] the Costellos argued that the expense of a consultant "would impose . . . an unfair financial burden" and that they were "well qualified to evaluate" the confidential information themselves.[10]

The court granted summary judgment dismissing the Costellos' access to records claim, stating in part:

> there is no disputed issue of material fact as to the first cause of action set forth in the plaintiffs' Complaint, that the documents plaintiffs seek are outside the scope of those required to be allowed inspection under RCW 24.06.160 and under Tanner's Member

---

[7] Report of Proceedings (September 12, 2014) at 8-9.

[8] Id. at 21.

[9] Id. at 22.

[10] Id.

5

Access to Information Policy, that **defendant has already allowed plaintiffs inspection of the requested documents under this Court's terms** *(i.e., the Protective Order entered in this matter)*, and that the defendant is entitled to judgment dismissing that claim as a matter of law.[11]

The Costellos moved to dismiss Tanner's counterclaims, but the court denied the motion and ultimately granted summary judgment for Tanner in the amount of $45.70.

On April 24, 2015, the court entered an order awarding Tanner attorney fees and costs. The order states in pertinent part:

> a. Plaintiffs entered into a **Membership Agreement contract** with Defendant. The Membership Agreement contained a provision which provided that reasonable **attorney fees would be paid to Defendant in the event it was necessary an attorney needed to be retained to collect on amounts that were due** to Defendant. As Plaintiffs would not pay Defendant the amount they owed, claiming that the outstanding amounts were based on charges that were against the law, Defendant incurred attorney fees in disproving Plaintiffs' reasons for not paying the charges and in collection of the charges. As a result, Plaintiffs are to be made to pay Defendant's attorney fees incurred in opposing Plaintiffs' Counts II, III and IV of the complaint and are to be made to pay Defendant's attorney fees incurred in bringing counterclaims for payment of amounts due.
>
> b. Plaintiffs' complaint contained three separate causes of action which were not well grounded in fact and/or not warranted by existing law. Count II of Plaintiffs' complaint alleged that Defendant's smart meters invaded Plaintiffs' privacy. However, as Plaintiffs' never had a smart meter installed, it was factually impossible for the smart meters to invade Plaintiffs' privacy. Count III of Plaintiffs' complaint was wholly baseless as it alleged that Defendant violated Washington's law against discrimination; Plaintiffs claim that they are members of a protected class by virtue of their legal claim and ideology against smart meters was tautologically self-serving. Plaintiffs' claim IV that Defendant

---

11 Clerk's Papers at 1364 (emphasis added).

violated Washington Consumer Protection Law was unsupportable under the law.

c. Defendant was the prevailing party in this matter which contained monetary claims for less than $10,000. Defendant properly provided a written settlement letter to Plaintiffs which was rejected. Defendant later was awarded judgment in an amount that exceeded the amount Defendant offered to settle this dispute. Accordingly, **pursuant to RCW 4.84.250, attorney fees and costs in defense of Plaintiff's claims seeking monetary relief *(i.e.* Counts II, III, and IV) and associated with their affirmative counterclaims are mandated.** The purpose of this statute involves penalizing parties who unjustifiably bring or resist small claims.

d. Tanner is also entitled to statutory fees and costs available under RCW 4.84.080 as the prevailing party on all counts.[12]

The court awarded Tanner $119,617.53 in attorney fees and $10,189.87 in costs.

The Costellos appeal the dismissal of their access to records and CPA claims, the judgment on Tanner's counterclaims, and the award of attorney fees and costs.

## ACCESS TO BOOKS AND RECORDS

The Costellos first contend the court erred in dismissing their claim for access to Tanner's books and records on summary judgment. On review of a summary judgment, we engage in the same inquiry as the trial court.[13] Summary judgment is appropriate if there is no genuine issue of material fact and the

---

[12] Clerk's Papers at 2165-66 (emphasis added).

[13] New Cingular Wireless PCS, LLC v. City of Clyde Hill, 187 Wn. App. 210, 215, 349 P.3d 53 (2015).

moving party is entitled to a judgment as a matter of law.[14] The court properly granted summary judgment on this claim.

The Costellos' complaint alleged in part that, as members of the cooperative, they had a right to review Tanner's records and that Tanner failed to provide "information regarding the smart meter program." Because some of the records related to a third party vendor and proprietary information, the trial court granted Tanner's request for a protective order limiting the Costellos' access to "highly confidential" information. The order stated that "a receiving Party may disclose Highly Confidential Documents . . . only to the receiving Party's counsel of record in this Litigation, and/or to independent experts or consultants."[15] The Costellos contend the court misinterpreted this provision, arguing that "[t]here is no language restricting pro se litigants from receiving Highly Confidential information" and "no 'Attorney's Eyes Only' language in the Protective Order."[16]

Interpretation of a court order is a question of law that we review de novo.[17] We interpret such orders to give effect to the issuing court's intent.[18] The protective order in this case plainly states that highly confidential information

_____

[14] CR 56(c).

[15] Clerk's Papers at 789-90.

[16] Appellants' Brief at 21-22.

[17] In re Marriage of Thompson, 97 Wn. App. 873, 877, 988 P.2d 499 (1999).

[18] Hill v. Hill, 3 Wn. App. 783, 786, 477 P.2d 931 (1970), *overruled on other grounds by* Stokes v. Polley, 145 Wn.2d 341, 37 P.3d 1211 (2001).

can be disclosed by the receiving party "*only* to the receiving Party's counsel of record in this Litigation, and/or to independent experts or consultants . . . who have signed the "Acknowledgment and Agreement to Be Bound."[19] The order does not provide for disclosure of highly confidential information to a party. Significantly, the order, which was drafted and entered when the Costellos were represented by counsel, equates "counsel of record" with "attorneys." The order nowhere addresses parties proceeding pro se. The plain language of the order thus limits disclosure to officers of the court or experts bound by a nondisclosure agreement. It also effectuates the court's intent, which it expressed by adopting Tanner's proposed order without modifying the access restrictions as requested by the Costellos.

We reject the Costellos' argument that the words "[a] receiving party may disclose" in the order implicitly grant the receiving party the right to review highly confidential information before disclosing the information to others. This interpretation reads language into the order and is contrary to the court's intent.

We also reject the Costellos' claim that the court restricted them from accessing information they needed to prosecute their case. To the contrary, the protective order allowed them to access highly confidential information through counsel or an expert *or* through modification of the order after their attorney withdrew. The record demonstrates that the Costellos were fully aware of these options and declined to pursue them.

---

[19] Clerk's Papers at 790 (emphasis added).

To the extent the Costellos suggest the court's protective order is somehow trumped by the corporate books and records statute, RCW 24.06,[20] their claim is neither sufficiently argued nor persuasive. RCW 24.06.160 provides:

> Each corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its members, shareholders, board of directors, and committees having any of the authority of the board of directors; and shall keep at its registered office or principal office in this state a record of the names and addresses of its members and shareholders entitled to vote. **All books and records of a corporation may be inspected by any member** or shareholder, or his or her agent or attorney, for any proper purpose at any reasonable time.[21]

The parties agree that this statute applies to Tanner. The Costellos claim, however, that the emphasized language permits them to access the records at issue in this case.

But even assuming the Costellos' broad reading of "All books and records" is correct,[22] CR 26(c) allows a court to protect records upon a proper showing.[23]

---

[20] See n.4, supra.

[21] (Emphasis added.)

[22] See Nakata v. Blue Bird, Inc., 146 Wn. App. 267, 275, 191 P.3d 900 (2008) (holding under a different corporate record statute, RCW 23B.16.020, that "Cooperative association members have the right to inspect and copy business records, including accounting records, excerpts from minutes of any meeting of the board of directions, and the record of shareholders.").

[23] CR 26(c) provides in part:

**(c) Protective Orders.** Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the

Any conflict between the statute and CR 26(c) is governed by well-settled principles. "When a court rule and a statute conflict, the court will attempt to harmonize them, giving effect to both."[24] If they cannot be harmonized, "the court rule will prevail in procedural matters and the statute will prevail in substantive matters."[25] The Costellos do not mention, let alone apply, these principles. Accordingly, any claim that the statute controls over the court rule is insufficiently argued and need not be considered.[26]

We note, however, that the statute and court rule appear to be easily harmonized by reading them to grant broad access to corporate books and records, but allowing the court, upon a proper showing, to restrict such access to a party's counsel or expert. Moreover, courts avoid interpretations of statutes that lead to absurd results.[27] To read RCW 24.06.160 as allowing direct access

---

discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the court; (6) that the contents of a deposition not be disclosed or be disclosed only in a designated way; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way. . . .

[24] City of Fircrest v. Jensen, 158 Wn.2d 384, 394, 143 P.3d 776 (2006).

[25] Putman v. Wenatchee Valley Med. Ctr., 166 Wn.2d 974, 980, 216 P.3d 374 (2009).

[26] State v. Elliott, 114 Wn.2d 6, 15, 785 P.2d 440 (1990) (appellate court need not consider claims that are insufficiently argued); State v. Marintorres, 93 Wn. App. 442, 452, 969 P.2d 501 (1999) (appellate court need not consider pro se arguments that are conclusory); State v. Thomas, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004) (court will not review pro se arguments that receive only passing treatment).

[27] Mechling v. City of Monroe, 152 Wn. App. 830, 845, 222 P.3d 808 (2009) (when interpreting statutes, courts avoid any "unlikely, absurd, or strained result.").

to any and all documents, no matter how sensitive or confidential, would arguably lead to such a result.

The Costellos also contend that, even accepting the court's interpretation of the protective order, some documents did not qualify as "highly confidential" documents or were not associated with the third party contract and should have been disclosed. The recourse for these alleged abuses of the order was provided by sections 11(c) and (d) of the protective order. But because the Costellos proceeded without counsel or an expert, and because they failed to move to modify the protective order, they were unable to view or meaningfully challenge any erroneous confidential designations. Furthermore, the order dismissing the access to records claim states that "defendant has *already allowed plaintiffs inspection of the requested documents* under this court's terms (i.e., the Protective Order entered in this matter."[28] This statement indicates that all requested records were either provided to the Costellos or were designated as highly confidential and available for inspection via the protective order. The Costellos' claim to the contrary is unreviewable since the protected documents are not in this court's record. We note, however, that it appears from Tanner's "Log of Highly Confidential Documents Withheld Pursuant to Protective Order" that virtually all of the requested information listed by the Costellos at page 20 of their opening brief has been provided via the protective order.

---

[28] Clerk's Papers at 1364 (emphasis added).

In light of our conclusions, we need not reach the Costellos' challenges to the court's reliance on Tanner's information policy and RCW 24.06.160.

## CONSUMER PROTECTION ACT CLAIM

The court dismissed the Costellos' Consumer Protection Act claim on summary judgment. The court expressly relied on <u>Haberman v. Washington Public Power Supply System</u>.[29] In <u>Haberman</u>, the State Supreme Court held that rural electric cooperatives are exempt from the CPA, stating:

> Intervenors take exception to the trial court's conclusion that because rural electric cooperatives are otherwise regulated, they are exempt from the CPA. The CPA exempts "transactions permitted by any other regulatory body". RCW 19.86.170. <u>See Tokarz v. Frontier Fed. Sav. & Loan Ass'n</u>, 33 Wn. App. 456, 464 n.5, 656 P.2d 1089 (1982). The Rural Electrification Administration (REA), a federal agency, closely monitors and extensively controls the acts of rural electric associations borrowing money from the REA. <u>In re Dairyland Power Coop.</u>, 37 F.P.C. 12, 18 (1967). Here, however, the record contains no assertion that any of the respondent electrical associations were Administration borrowers and therefore subject to such control by the REA.
> <u>Nevertheless, as the rural electric cooperatives, like the respondent PUD's and municipal utilities, are nonprofit, consumer-owned utilities serving those who reside within their service areas, there exists no public policy reason as expressed by the CPA why the cooperatives should not be likewise exempt from the CPA.</u> Moreover, these entities allegedly violated the CPA only by virtue of their relationship with the Supply System, which is exempt from the CPA. <u>We conclude that to subject the respondent rural electric cooperatives to potential CPA liability would be contrary to the Legislature's purpose in excluding municipal corporations from liability under the CPA.</u> Therefore, we hold in light of the unique facts of this case that, like the Supply System and other governmental entities admittedly exempt from the CPA, respondent rural electric cooperatives are also exempt from the CPA under our

---

[29] 109 Wn.2d 107, 171-72, 744 P.2d 1032, 1072 (1987), <u>amended</u>, 109 Wn.2d 107, 750 P.2d 254 (1988).

reasoning in <u>Washington Natural Gas Co. v. PUD 1</u>, *supra* at 98. We affirm the trial court's dismissal of intervenors' CPA claims against respondents.[30]

Because Tanner is a "rural electric cooperative,"[31] <u>Haberman</u>'s holding, which is binding on this court,[32] exempts Tanner from the CPA.

This conclusion is buttressed by <u>Haberman</u>'s reliance on <u>Washington Natural Gas Co. v. PUD 1</u>, 77 Wn.2d 94, 98, 459 P.2d 633 (1969). In that case, the court noted that

> [b]y its very terms, that act, RCW 19.86[.010(1)], includes only 'natural persons, corporations, trusts, unincorporated associations and partnerships.' . . . Nowhere does its language imply that municipal corporations or political subdivisions of the state are within the definition of persons and entities made subject to it. Thus, the legislature did not employ language designed to bring public utility districts within the operation of the statute nor leave room to include them within it by construction.[33]

The same is true here. The Costellos' attempts to distinguish or limit <u>Haberman</u>'s holding are not persuasive.

We also reject their argument that the text and legislative history of SHB 1896 indicate that the CPA applies to Tanner. Tanner correctly points out, and the Costellos concede, that the relevant portion of SHB 1896 was later removed by HB 2264 before SHB 1896 became effective.

---

[30] <u>Haberman</u>, 109 Wn.2d at 171.

[31] <u>Tanner Elec. Co-op v. Puget Sound Power & Light Co.</u>, 128 Wn.2d 656, 659, 911 P.2d 1301 (1996).

[32] <u>Fondren v. Klickitat County</u>, 79 Wn. App. 850, 856, 905 P.2d 928 (1995) (decisions of the State Supreme Court are binding on all lower state courts).

[33] 77 Wn.2d at 98.

14

The superior court did not err in dismissing the Costellos' CPA claim.

## TANNER'S COUNTERCLAIM

The Costellos next contend the superior court erred in granting Tanner summary judgment on its counterclaim for $45.70 in unpaid charges and $0.89 in pre-judgment interest. They contend the counterclaim is barred by the doctrine of accord and satisfaction and is contrary to Tanner's bylaws. They also contend there are issues of fact as to the *amount* owing on the counterclaim.

In the argument section of their opening brief, the Costellos provide one conclusory sentence in support of their accord and satisfaction claim: "An accord and satisfaction was accomplished prior to Tanner claiming late fees and interest."[34] This is insufficient. We do not consider issues that are inadequately argued or given only passing treatment on appeal, and we apply this rule to attorneys and pro se litigants alike.[35]

The Costellos also claim Tanner's billing method violates its bylaws. According to the Costellos, the bylaws only require payment for energy actually used by a member. Therefore, they maintain they properly refused to pay energy charges that exceeded their actual use and any late fees on those unpaid charges. We disagree.

In an effort to reduce the frequency and cost of meter readings for opt-out members, Tanner adopted a policy whereby opt-out members' meters are read

---

[34] Appellants' Brief at 40.

[35] Note 13, <u>supra</u>.

quarterly. In the first two months of a quarter, Tanner bills these members for an estimated usage based on their usage history. In the third month, Tanner bills them based on the quarterly meter reading and 'trues up' the total quarter charges by crediting or billing for any difference between the members' actual usage and their estimated use. Nothing in Tanner's bylaws precludes this billing method. And contrary to the Costellos' assertions, Tanner's method of truing up charges quarterly is consistent with bylaws requiring members to pay for energy used by or provided to a member.

The Costellos further assert that Tanner's "budget billing" method for opt-out members does not comply with the budget billing option described in its monthly statements and is made up "out of thin air."[36] But as Tanner explains in its response, budget billing for opt-out members is distinct from the budget billing option in members' monthly statements. The former is described in Tanner's opt-out policy as follows:

> **Members who are not served through an AMI Meter shall be billed for estimated usage each month under Tanner's "budget billing" plan, which bills members based on estimated monthly usage and does not require monthly meter reads.** In addition, such members shall be assessed a monthly charge of $23.33 to cover the cost to Tanner of sending a technician to the member's residence to perform periodic "true up" meter reads, and to manually input usage information into Tanner's billing system. In the month following any "true up" meter read, Tanner will adjust the member's bill up or down to reflect actual usage compared to the amount billed/paid under the budget billing plan. If there is more than one non-AMI Meter at a residential metering location, there

---

[36] Appellants' Brief at 43 n.53.

shall be an additional monthly charge of $5 for each additional non-AMI Meter.[37]

Lastly, the Costellos contend the opt-out fee, which started at $23.33 and later increased to $30, is also unsubstantiated and created "out of thin air."[38] Tanner responds, and the Costellos do not dispute, that its rates and policies are entitled to a presumption of validity, and that the presumption can be overcome only by showing that the rate is arbitrary and capricious.[39] Tanner contends its opt-out fee for periodically reading the Costellos' meter is "well within the range of what other utilities charge . . . and is based on cost inputs similar to those for a service call."[40] Evidence in the record, including the declaration of Tanner's general manager Steven Walter, support this contention. Tanner's opt-out fee is in fact well within the range of opt-out fees charged by other electric utilities. The record also demonstrates that the fee is not created "out of thin air," as the Costellos allege. According to Tanner's policies and declarations, the $23.33

---

[37] Clerk's Papers at 1723-24 (emphasis added).

[38] Appellants' Brief at 41.

[39] Cf. e.g., Faxe v. City of Grandview, 48 Wn.2d 342, 352, 294 P.2d 402 (1956) ("Rates established by a municipality for utility service to inhabitants are presumptively reasonable" and the person challenging the rates must show that it is unreasonable); Mun. of Metro. Seattle v. Div. 587, Amalgamated Transit Union, 118 Wn.2d 639, 646, 826 P.2d 167 (1992) quoting City of Tacoma v. City of Tacoma Taxpayers, 108 Wn.2d 679, 695, 743 P.2d 793 (1987) ("We limit judicial review of municipal utility choices to whether the particular contract or action was arbitrary or capricious, or unreasonable."); see also Davis v. Cox, 180 Wn. App. 514, 535, 325 P.3d 255, 267, review granted, 182 Wn.2d 1008 (2014), rev'd on other grounds, 183 Wn.2d 269 (2015) (decision of cooperative board comes within ambit of business judgment rule, which "cautions against courts substituting their judgment for that of the board of directors, absent evidence of fraud, dishonesty, or incompetence.").

[40] Respondent's Brief at 38 n.34.

monthly fee is based on a $70 service call fee for "sending a technician to the member's residence to perform periodic 'true up' meter reads," and the cost of manually inputting usage information into Tanner's billing system.[41] The service call fee is based on wages, benefits and vehicle operating costs. There is no issue of fact as to whether Tanner's fee is arbitrary and capricious.

The Costellos argue, however, that there are issues of fact concerning Tanner's actual cost basis for the opt-out fee. They point to the following calculations, which they submitted below, to support their contention:

> Plaintiff live[s] 5 miles from the Tanner main office where the serviceman is dispatched and administrative duties are performed. At the posted speed limit, it takes less than 8 minutes to drive that distance one way. Total time for a meter read is less than 16 minutes. At an IRS mileage rate of 0.56/mile and a burdened labor rate of $55/hr., the actual cost based charge for a single meter read is $20.27 (not $90 [per trip currently claimed by Tanner, or the original $70 per trip)]. The cost of four [quarterly] meter reads annually, spread over 12 months . . . is $6.76.[42]

These calculations do not create a material issue of fact. They were not submitted by an expert, do not include Tanner's cost of inputting meter readings into Tanner's billing system, are based in part on the unsupported assumption that the Costellos are entitled to an individualized opt-out fee based on how far they live from Tanner's main office,[43] and do not rebut Tanner's evidence that

---

[41] Clerk's Papers at 1724.

[42] Clerk's Papers at 1385.

[43] Cf. Hillis Homes v. PUD 1, 105 Wn.2d 288, 301, 714 P.2d 1163 (1986) (charges need not be individualized according to the benefits accruing to each specific customer as long as the charge has a practical basis and the classification of customers is reasonable).

their opt-out fee is within the range of opt-out fees charged by similar providers. Therefore, the Costellos' calculations do not establish a genuine issue of material fact whether the opt-out fee is arbitrary and capricious.

The Costellos also claim that even if Tanner's opt-out fee is not arbitrary and capricious, there is a genuine issue of material fact whether Tanner correctly calculated the amount owed on its counterclaim. They contend Tanner "overcharged them in the amount of $198.97 due to energy overcharge and computational errors."[44] This contention is apparently based on the Costellos' argument, rejected above, that they had no obligation under Tanner's bylaws to pay estimated charges that exceeded actual meter readings for a given month. But as discussed above, Tanner's billing method for opt-out members is consistent with the bylaws because charges are trued up quarterly to reflect the Costellos' actual usage. The bylaws require the Costellos to pay for their actual usage and their refusal to do so is unjustified.

Finally, the Costellos argue that Tanner's calculation of the amount owing is mathematically incorrect. This argument fails for two reasons. First, the Costellos' argument in their brief consists of conclusory assertions that do not demonstrate the computational errors they allege. Instead, the Costellos merely cite to superior court pleadings and appendices to their brief to support their

---

[44] Appellants' Brief at 42.

conclusory claims. This is not sufficient.[45] Second, their argument was first

raised on reconsideration below and involved analysis and calculations not

previously presented to the court. A trial court need not consider such new

claims for the first time on reconsideration.[46] We review a court's ruling on

reconsideration for abuse of discretion.[47] Thus, even if the argument had been

properly presented in the Costellos' appellate briefs, we could not say the trial

court abused its discretion in denying the motion for reconsideration.

## ATTORNEY FEES AND COSTS

The Costellos next contend the court abused its discretion in awarding

Tanner attorney fees and costs. They maintain that the court's three bases for

the award – the membership agreement, the small claims statute (RCW

4.84.250), and the frivolous action statute (RCW 4.84.185) – do not support an

award in this case.

RCW 4.84.250 provides that in cases involving claims of $10,000 or less,

attorney fees and costs may be awarded to the prevailing party. For purposes of

RCW 4.84.250, a party is a "prevailing party" if their recovery exceeds the

---

[45] See Holland v. City of Tacoma, 90 Wn. App. 533, 538, 954 P.2d 290 (concluding that a party who merely referenced his trial court briefs in his appellate briefs, rather than using space in his appellate brief to set forth the arguments, 'has abandoned the issues for which he attempted to incorporate arguments by reference to trial briefs or otherwise'), review denied, 136 Wn.2d 1015 (1998).

[46] See e.g., Wilcox v. Lexington Eye Inst., 130 Wn. App. 234, 241, 122 P.3d 729 (2005) (affirming denial of reconsideration where argument on reconsideration raised new arguments and relied on new portions of the record).

[47] Id.

amount of their settlement offer.[48] The Costellos concede that Tanner recovered more than it offered in settlement of its counterclaims, but contend the amount it recovered should have been less. We have rejected that contention above. The court did not abuse its discretion in awarding fees and costs for Tanner's counterclaim. The court did, however, abuse its discretion in also awarding fees under RCW 4.84.250 for Tanner's defense against the Costellos' complaint because the offer of settlement was solely on Tanner's counterclaims.

The Costellos next contend the court abused its discretion in awarding fees to Tanner under the membership agreement. That agreement states in part:

> d. If the account is placed with an attorney or sued, I agree to pay a reasonable amount for attorney fees, and if placed with a collection agency I realize holder will be damaged in the amount charged for collection; and therefore agree to pay, as liquidated damages and in addition to the balance then due, an amount equal to said collection charge, not exceeding however, fifty percent of said unpaid balance.
>
> e. . . . in the event a suit is commenced for the purpose of collecting any past due bill, then venue may be laid at the option of Tanner Electric Cooperative, in King County, Washington.[49]

The trial court awarded fees under this provision for Tanner's counterclaim to collect unpaid charges and/or late fees *and* for its defense against the Costellos' constitutional, statutory, and CPA claims, stating:

> The Membership Agreement contained a provision which provided that reasonable attorney fees would be paid to Defendant in the event it was necessary an attorney needed to be retained to collect

---

[48] Filipino American League v. Carino, 183 Wn. App. 122, 129, 332 P.3d 1150 (2014).

[49] Clerk's Papers at 2096.

on amounts that were due to Defendant. As Plaintiffs would not pay Defendant the amount they owed, claiming that the outstanding amounts were based on charges that were against the law, Defendant incurred attorney fees in disproving Plaintiffs' reasons for not paying the charges and in collection of the charges. As a result, Plaintiffs are to be made to pay Defendant's attorney fees incurred in opposing Plaintiffs' Counts II, III and IV of the complaint and are to be made to pay Defendant's attorney fees incurred in bringing counterclaims for payment of amounts due.[50]

We agree with the trial court's conclusion that the attorney fee provision applies to actions to collect unpaid charges.[51] Therefore, the court properly applied the provision to Tanner's counterclaim for unpaid charges.

We disagree, however, with the court's conclusion that the fee provision applied to Tanner's defense against the Costellos' constitutional and statutory challenges to the opt-out fee. The trial court reasoned that Tanner's defense to those claims was essentially a collection effort because the Costellos' "would not pay Defendant the amount they owed." But this is not entirely accurate.

On October 18, 2013, shortly after filing their complaint, the Costellos paid all unpaid opt-out fees and thereafter paid the opt-out fee under protest. They also did not contest the legality of any late fees and offered to pay them following clarification of certain alleged billing errors at issue in the counterclaim. Thus, as

---

[50] Clerk's Papers at 2165.

[51] The Costellos' argument that the membership agreement is a contract of adhesion, and therefore unenforceable, and is too conclusory to merit discussion. See Zuver v. Airtouch Commc'ns, Inc., 153 Wn.2d 293, 304, 103 P.3d 753 (2004) ("[T]o the extent that the characterization of a contract as an adhesion contract has any relevance to determining the validity of a contract, it is only in looking for procedural unconscionability; the fact that an agreement is an adhesion contract does not necessarily render it procedurally unconscionable.").

of October 18, 2013, Tanner's defense against the Costellos' claims regarding the opt-out fee could not fairly be characterized as an action to collect *unpaid* opt-out fees. Accordingly, Tanner is not entitled to fees and costs incurred in defending against the Costellos' claims after October 18, 2013.

Tanner argues alternatively that it was entitled to fees for defending against the Costellos' claims under the frivolous action statute, RCW 4.84.185. But fees may be awarded under that statute only if all claims against the prevailing party were frivolous.[52] The Costellos point out that while the trial court found three of their claims frivolous, it did not find their claim for access to records frivolous. Tanner does not dispute that point or argue that the access to records claim was frivolous. Therefore, Tanner is not entitled to fees under RCW 4.84.185. Because the award of attorney fees must be recalculated, the Costellos' arguments regarding fee segregation are best addressed to the trial court on remand.

## ATTORNEY FEES ON APPEAL

Citing the same authorities it cites in support of the award of attorney fees below, Tanner requests attorney fees as the prevailing party on appeal. "If [attorney] fees are allowable at trial, the prevailing party may recover fees on appeal as well."[53] Although the appeal is not frivolous and fees are therefore not

---

[52] State ex rel. Quick–Ruben v. Verharen, 136 Wn.2d 888, 903-04, 969 P.2d 64 (1998) (fees may be awarded under RCW 4.84.185 only if lawsuit is frivolous in its entirety).

[53] Landberg v. Carlson, 108 Wn. App. 749, 758, 33 P.3d 406 (2001).

available on appeal under RCW 4.84.185, Tanner is entitled to fees under the contract and RCW 4.84.250 for that portion of its fees on appeal relating to the resolution of its counterclaim. The amount of the award of fees shall be determined by the trial court on remand pursuant to RAP 18.1(i) and the other Rules of Appellate Procedure.

The orders on summary judgment are affirmed. The award of attorney fees is reversed in part and remanded for further proceedings consistent with this opinion.

Cox, J.

WE CONCUR:

Trickey, J

Appelwick, J